UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 3:20-CR-26 JD |
| BENJAMIN HICKS | |

**OPINION AND ORDER**

Defendant Benjamin Hicks has filed several objections to the Presentence Investigation

Report ("PSR"). (DE 131.) The Court now overrules these objections, finding that the disputed

paragraphs in the PSR are supported by a preponderance of the evidence. The Court also finds

that an obstruction of justice enhancement is warranted, given that Hicks made several false

statements when testifying under oath at his evidentiary hearing in an attempt to minimize his

role. For the same reason, Hicks is not eligible to receive a reduction for acceptance of

responsibility.

A.      **Factual Background**

The Court recounts the undisputed factual contentions in the PSR. In May of 2019, a trip

was planned to California for the purpose of obtaining methamphetamine. (DE 130 ¶ 7.) Both

parties admit that Terrence Reid and Brandon James were "primary individuals" in the

conspiracy to obtain bulk methamphetamine. (*Id.* ¶ 24, DE 131 at 2.) However, it is contested

whether Benjamin Hicks was also a primary individual in the conspiracy to obtain

methamphetamine. (*Id.* ¶ 24, DE 131 at 2.) The PSR indicates Hicks was a primary individual

who provided "bulk cash" to the venture (DE 130 ¶¶ 7, 24), while the Defense argues that he was

merely a money lender who would be paid back in interest. (DE 131 at 1–2.) It is undisputed,

however, that Hicks and James each gave Terrence Reid a large amount of cash, approximately $25,000 each or $50,000 total. (DE 130 ¶ 7; DE 131 at 1; 143-1 at 44.)

Prior to the trip to California, on May 29, 2019, Terrence Reid, Kelvin Franklin, and Tallisha Malone drove to Chicago and met with Hicks and James in a building located at 3348 W. Polk Street in Chicago, Illinois. Both parties agree that, during this meeting, Malone was offered a job to fly to California, rent a vehicle, and drive it back to the Chicago/South Bend area. Both parties also agree that Malone was given $2,000 to put on a debit card to purchase flights and rent a car. The parties dispute, however, whether it was Reid or Hicks who offered Malone the job and gave Malone the $2,000 dollars. (DE 130 ¶ 17; DE 131 at 1.)

The day after this meeting, Malone, Reid, James, Franklin, and David Tierney all drove to Hicks' residence before driving to O'Hare Airport in Chicago.[1] (DE 130 ¶ 18.) This group,[2] except for Hicks, then flew to California. (Id.) Once there, Malone rented a vehicle at Budget Car Rental. (Id. ¶ 19.) Reid, James, Franklin, Tierney, and Malone then went to the Hyatt Hotel, where they met with a man who gave the group "pumpkin shaped packages of methamphetamine." (Id.) Reid, Franklin, and James then paid the man with the money they took from Hicks' residence. (Id.) Reid, James, and Franklin packed the rental car with the drugs and told Malone and Tierney that it was ready to drive. Malone then drove with Tierney to Las Vegas, Nevada, where they met with Steven Hook and Tabitha Palen at a hotel. (Id. ¶ 20.) The PSR indicates that, at this point, Hicks called Malone and "told her to get on the road," which Defendant disputes. (Id. ¶ 20; DE 131 at 2.)

---

[1] Hicks initially objected to the PSR's statement that Hicks met with his co-conspirators on May 29th and May 30th, claiming that he only met with them once. (DE 131 at 1.) However, at the evidentiary hearing, counsel for Hicks, Mr. Lawson, withdrew this objection. (DE 166 at 139:17–140:2.)

[2] Multiple members of this group had nicknames. Hicks was known as "King," James was known as "B," Franklin was known as "Butter," and Reid was known as "Pooh." (DE 143-1 at 3, 16, 26.)

Hook and Palen then joined Malone and Tierney on the drive back to the Chicago/South Bend area, bringing a second vehicle. (DE 130  ¶ 20.) The pairs took turns driving the rental vehicle that contained the drugs. (*Id.*) Eventually, Hook and Malone were pulled over for speeding outside of Springfield, Missouri. (*Id.* ¶ 21.) Officers discovered, upon searching the vehicle, 36 bundles of methamphetamine. (*Id.*) A later lab analysis determined that these 36 bundles contained 17.12 kilograms of meth. (*Id.* ¶ 23.)

On March 11, 2020, a grand jury charged Benjamin Hicks with a conspiracy to distribute more than 500 grams of a mixture or substance containing methamphetamine, in violation of 21 U.S.C. § 846. (DE 1.) On February, 9, 2022, this Court accepted Hicks' plea of guilty to that charge. (DE 115.) In anticipation of Hicks' sentencing, Probation prepared a PSR. (DE 130.) In light of the PSR's description of the offense conduct, Hicks filed multiple objections, arguing that the PSR contains factually inaccurate information. (DE 131.)

After Hicks filed these objections, the Government submitted a supplemental sentencing memorandum, arguing that Hicks should now receive a sentence enhancement for obstruction of justice. (DE 156 at 8.) According to the Government, Hicks' objections warrant an enhancement because they are based on "materially false information" which is intended to falsely minimize his role. (*Id.*) The Government also argues in this supplement that Hicks should not receive a 2-level reduction for acceptance of responsibility under United States Sentencing Guidelines ("U.S.S.G") Section 3E1.1(a). (*Id.* at 10.)

On July 14, 2022, the Court heard evidence and argument from both the Government and Hicks concerning his objections. (DE 131; DE 161.) The Court also heard argument from counsel pertaining to the enhancement and the reduction. The Court now addresses the

objections raised by Defendant, as well as the arguments made by the Government concerning Hicks' offense level.

**B.     Objections to the PSR**

"Generally, facts considered at sentencing must be proved by a preponderance of the evidence." *United States v. Major*, 33 F.4th 370, 379 (7th Cir. 2022) (quoting *United States v. Lucas*, 670 F.3d 784, 792 (7th Cir. 2012)). The evidence considered at sentencing must be "reliable," not just "speculation or unfounded allegations." *United States v. England*, 555 F.3d 616, 622 (7th Cir. 2009). "Evidence will satisfy this requirement if it bears sufficient indicia of reliability to support its probable accuracy." *Lucas*, 670 F.3d at 792.  "Sentencing courts may also draw inferences and conclusions based on testimony given and evidence introduced at a sentencing hearing." *Major*, 33 F.4th at 379.

*(1) Objection to Paragraph 7*

Paragraph 7 of the PSR describes how Hicks, along with his co-conspirators Terrence Reid and Brandon James, met at an apartment in Chicago at the end of May 2019 and planned a trip to California for the purpose of obtaining methamphetamine. The PSR describes how the three men arranged to hire drivers to transport drugs back from California in a rental car and how Hicks provided "bulk cash" for the venture. (DE 130 ¶ 7.)

Hicks seeks to replace this paragraph with a new paragraph containing the following changes: (1) that it was Reid alone who planned the trip to California; (2) that it was Reid who arranged to hire drivers to transport the drugs back from California; and (3) that Hicks was simply "loaning" Reid money and not providing "bulk cash." (DE 131 at 1.) The Court overrules Defendant's objection and finds that paragraph 7 of the PSR is supported by a preponderance of the evidence.

As to the first two points, multiple other co-conspirators indicated in proffer interviews that Hicks helped plan the trip for the purchase of methamphetamine and also helped plan the transportation for that trip. For example, in his proffer, Reid provided a statement that "Hicks had approached [him] about trying to find a source of supply for methamphetamine in California, where they could purchase meth for a cheaper price." (DE 143-1 at 44.) Reid stated that it was Hicks who asked Malone whether she "would be interested" in being "the driver" who brought the "drugs back to Indiana." (*Id.*) Reid also indicated that it was Hicks who "told Malone he would pay her, and at that time, Hicks retrieved a vacuumed sealed bag of money, placed the money into a bag, and gave Reid the money." (*Id.*) Reid's version of the events is corroborated by the statements of Tallisha Malone in her proffer interview. In that interview, Malone stated that it was Hicks who "offered her a job to fly out to California to rent a vehicle, and drive the vehicle back to the Chicago, IL/South Bend, IN, area." (*Id.* at 23.) Malone also stated that Hicks "gave her $2000.00 to put on a debit card, to use for her flights and rental vehicles." (*Id.*)

In addition to planning transportation by offering Malone a job driving, Hicks also asked Steven Hook to help drive the methamphetamine back from California. In his proffer interview, "Hook stated that while in Las Vegas, he was contacted by a subject known to him as 'King B' (later identified as Benjamin Hicks) asking Hook if he knew anyone with a valid driver's license that would be willing to fly to Los Angeles, California to drive a 'package back to the Chicago, IL/South Bend, IN area.'" (*Id.* at 16.) Hook then called his friend David Tierney to help. (*Id.*) In an interview of Tamara Tierney, David Tierney's daughter, she provided statement's consistent with Hook's account by saying that "David Tierney recently travelled to California to pick up 36 pounds of methamphetamine for 'King'" (i.e., Hicks). (*Id.* at 9.) The above evidence clearly

supports that Hicks (1) helped plan the trip to California and (2) assisted in procuring drivers for the trip.

There is also evidence which supports that Hicks was not a mere money lender, but instead expected to receive methamphetamine in return for the cash he provided. For example, in his proffer interview, Hicks stated at least four times that he was expecting to receive fifteen to twenty pounds of methamphetamine in exchange for his contribution of twenty-five thousand dollars. *See infra* pp. 16–19. Additionally, Hicks also indicated in his proffer that the drugs were being delivered to *him* at an undetermined location. (DE 143-1 at 38.) In line with Hicks' statements, Reid stated in his proffer that while he (Reid) was only going to be paid in "3–4 pounds of methamphetamine," the "remainder of the methamphetamine was to be delivered for Hicks and James." (DE 143-1 at 46.) Finally, Tamara Tierney provided statements consistent with both Reid and Hicks when she stated that her dad, David Tierney, had "recently travelled to California to pick up 36 pounds of methamphetamine for King.'"[3] (*Id.* at 9.)

---

[3] Defendant did not object to the admission of the interviews provided by the Government at the evidentiary hearing for purposes of sentencing. (DE 166 at 67:11–14; DE 143.) Nor did the defendant make much effort to undermine the credibility of those statements. At the evidentiary hearing, Defense Counsel pointed to some minor "inconsistencies," such as Malone's later affidavit compared to Malone's earlier proffer, the fact that Reid states in his proffer that he bought the plane tickets while Hook states Hicks bought the plane tickets, and that Hook in his proffer states that Hicks called him, while Reid stated that it was James. (DE 166 at 135:1–137:11.) However, as the Court explains below,  the "inconsistencies" between Malone's affidavit and proffer are largely a matter of irrelevant, minor details, which her testimony then corrected. Additionally, the fact that Reid stated he bought the plane tickets, while Hook stated that Hicks bought the plane tickets, is also a minor inconsistency, if that: Hicks provided the money initially, while Reid used the money to buy the plane tickets, which makes both statements somewhat accurate. Finally, while there is some conflict as to who contacted Hook initially, the Court does not believe this undermines the reliability of either account, since Reid could have sincerely believed James was the one who contacted Hook given that he only had second-hand knowledge of the contact. However, given that Hook was the one who was actually contacted, and would have first-hand knowledge of who contacted him, the Court gives his account greater weight. Therefore, the Court independently finds that the proffer interviews are reliable, given that they are largely consistent with each another and that the defendant has done little to challenge the reliability. *United States v. Taylor*, 72 F.3d 533, 543 (7th Cir. 1995) (finding that PSR bore "sufficient indicia of reliability" where "individuals who provided this information gave largely consistent and mutually-corroborating accounts").

By objecting to the PSR, Hicks is asking the Court to disregard consistent statements from multiple different co-conspirators and witnesses in favor of his testimony at the July 14, 2022, evidentiary hearing. At his hearing, contrary to Reid's proffer statement, as well as his own, Hicks testified that the money provided was merely a "loan" and that he only expected the principal and interest back. (DE 166 at 93:16–25.) Additionally, even though Hook, Malone, and Reid gave statements indicating that Hicks helped plan the trip to California, Hicks testified that Reid "did everything" in terms of preparation, including "the flights and the hotels and the rental cars and everything." (*Id.* at 78:17–19.) Hicks further testified that he never gave Malone a job and never gave her money, despite Malone and Reid providing statements in their proffer interviews indicating otherwise. (*Id.* at 80:17–22.) Finally, Hicks testified that he never contacted Hook to get him involved in this conspiracy and that Hook never got drivers for him, even though Hook gave a proffer statement which indicated that it was Hicks who made the initial call. (*Id.* at 81:18–24.)

The Court finds that the statements by Hicks at the evidentiary hearing were false and should be given no weight. As indicated above, much of what Hicks stated directly conflicted with multiple other co-conspirators proffer statements, as well as his own proffer statement. However, not only did Hicks' testimony conflict with multiple proffer statements, it also directly conflicted with later portions of his testimony. For example, Hicks initially testified that he only knew the money was for methamphetamine after the "third or fourth" conversation with Reid, but then upon cross-examination changed his testimony to say that he knew it was for methamphetamine "as soon as" Reid asked for money. (DE 166 at 77:8–10, 97:6–10.) Another example of Hicks flip flopping occurred after he asserted in his testimony that he only expected to get paid back the principal amount of his "loan" plus some additional cash as interest. (*Id.* at

93:22–94:3.) Upon further cross examination, however, Hicks acknowledged in his testimony that he had stated during his proffer interview that he was "expecting to get 25 to 30 pounds or maybe 15 pounds [of methamphetamine] for [his] share together with Mr. James." (*Id.* at 94:19–24.) Hicks then states that the proffer interview was "accurate" because he "wasn't getting [drugs]." (*Id* at 95:1–5.) This is nonsense. The statement that Hicks was "expecting to get 25 to 30 pounds [of methamphetamine]," which Hicks made during his proffer interview, is completely incompatible with his statements during his sworn testimony that he "wasn't getting [drugs]" and only expected to receive interest on a loan. One of these assertions is a lie: either he was expecting to get methamphetamine in return for the money he provided or he was not. Given that other co-conspirators testified that he was supposed to get methamphetamine from the deal, and that Hicks himself said this multiple times during his proffer interview, the Court finds that Hicks' testimony at the evidentiary hearing concerning him merely providing a loan was false.

The Court also notes that it gives more weight to Tallisha Malone's initial proffer statement and testimony, rather than to her affidavit. Following her proffer statement, an affidavit from Ms. Malone was submitted as an exhibit which purports to "correct the record." (DE 153-5 ¶ 3.) Despite ostensibly "correcting" the record, many of the statements in the affidavit from Malone, while technically true, are misleading and leave out critical pieces of qualifying information. For example, the affidavit states that Malone "never saw stacks of money inside kitchen cabinets at the apartment where I met Mr. Hicks." (DE 153-5 ¶ 8.) However, at the hearing, she testified that she "saw bags full of cash" at the apartment where she met Hicks. (DE 166 at 26:23–24.) In the affidavit, Malone states that it was "Mr. Reid [who] first offered me a job in the Conspiracy to drive the drugs from Los Angeles to the South Bend area." (DE 135-5 ¶ 9.) However, in her testimony, she explained that while Reid was the one who "first brought up

the idea of flying somewhere and driving back" (DE 166 at 27:22–24), Hicks was the one who later formally asked her to fly to California and then drive the drugs back. (*Id.* at 28:14–29:1.) In paragraphs 10, 11, and 12 of the affidavit, Malone stated that Reid gave her $2,000 in cash to put on a debit card to cover her traveling expenses, $2,000 in cash to put on a debit card to cover David Tierney's travelling expenses, and that "Mr. Hicks never gave money to me." (DE 135-5 ¶¶ 10–12.) However, when testifying, Malone explained that while Hicks did not physically hand her the money, the money came from the bags of money that were at Hicks' apartment. (DE 166 at 29:15–25.) Finally, in her affidavit, Malone stated that "Mr. Hicks had a small role in the Conspiracy, which was mostly just giving money to Mr. Reid." (DE 135-5 ¶ 21.) However, she explained in her testimony that she meant he had a smaller role in that "he didn't catch the flight" and "didn't do no transaction." (DE 166 at 34:1–10.) Malone also stated in her testimony that she only met Hicks "one time" and that she did not know whether Hicks "was a leader of the conspiracy." (*Id.* at 34:18–20, 44:25–45:4.)

With the qualifying information from Malone's subsequent testimony, it is clear that there is nothing in the affidavit which undercuts her statements in the initial proffer that (1) Hicks was the one who offered Malone the job to drive the drugs back from California and (2) that Malone received money which could be traced to Hicks, even though it may have physically been handed to her by Reid. Malone's testimony and proffer are also consistent with Reid's proffer statement, which indicated that it was Hicks who "told Malone he would pay her, and at that time, Hicks retrieved a vacuumed sealed bag of money, placed the money into a bag, and gave Reid the money." (DE 143-1 at 44.)

To the extent that Malone's affidavit "corrects the record" at all, it only does so by correcting small details which have no impact on the ultimate sentencing decision. Whether the

cash was kept in stacks in the cabinet or in bags on the ground, or whether it was Reid who physically handed the cash to Malone, are both inconsequential to the Court's ultimate sentencing decision. Since ruling on these minor factual details would not affect the Court's ultimate decision, any specific ruling is unnecessary. Fed. R. Crim. P. 32(i)(3)(B) ("[F]or any disputed portion of the presentence report, [the court must] rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing."). The Court therefore finds that the affidavit submitted to "correct the record" also does not support Hicks' objection.

Accordingly, given the evidence indicating: (1) that Hicks helped plan the trip to California; (2) that Hicks helped arrange to hire drivers to transport the drugs back from California; and (3) that Hicks was not simply "loaning" Reid money for the purchase of the meth, the Court overrules Hicks' objection to Paragraph 7.

### (2) Objection to Paragraphs 17 and 18

Paragraph 17 and 18 of the PSR describes how Reid, Franklin, and Malone drove to Chicago and met with Hicks and James in a building in Chicago which was guarded by an individual with an assault style weapon. (DE 130 ¶¶ 17–18.) Once inside, stacks of cash were observed in the kitchen cabinets. (*Id.*) Hicks then offered Malone a job to fly to California, rent a vehicle and drive it back to the Chicago/South Bend area. (*Id.*) Malone was also given $2,000 dollars to put on a debit card to use for flights and the rental car.[4]

---

[4] Defendant also initially objected to the number of meetings he had with his co-conspirators, claiming that he only met with his co-conspirators once, on May 30, 2019. (DE 131 at 1.) However, at the hearing, this objection was withdrawn. (DE 166 at 139:18–140:2.)

Hicks seeks to change these paragraphs of the PSR by: (1) indicating that it was Reid who gave Malone $2,000 to put on a debit card, not Hicks; (2) specifying that it was Reid, not Hicks, who confirmed that Malone would fly to California, rent a vehicle and drive it back to Chicago/South Bend area; (3) removing the references to stacks of cash in kitchen cabinets and a gunman monitoring the building; and (4) emphasizing that Hicks stayed in Chicago and did not travel to Los Angeles.

The Court overrules the objection and finds that paragraph 17 and 18 of the PSR are supported by a preponderance of the evidence. As the Court previously noted, Hicks' culpability does not depend on whether it was Reid who physically handed the money to Malone, since the evidence shows that Hicks was the one who originally provided this money to Reid. *See Supra* pp. 8–9. Nor does whether there were stacks of cash rather than bags of cash, or whether there was a gunman posted outside of the apartment affect this Court's sentencing decision. Finally, the PSR makes it clear that Hicks was not one of the co-conspirators who traveled to California. (DE 130 ¶¶ 8, 14, 18.) Accordingly, ruling on these specific factual objections is unnecessary as they will not impact the Court's sentencing decision. *See United States v. Gamez*, No. 2:19-CR-114 JD, 2022 WL 1963643, at *1 (N.D. Ind. June 6, 2022) (explaining that because resolving the objection would "not affect [the defendant's] sentencing . . . a ruling on this objection is unnecessary." *United States v. Santoya*, 493 F. Supp. 2d 1075, 1076 (E.D. Wis. 2007) (explaining that because the "objections did not affect the guidelines . . . I ma[ke] no findings on them"); *United States v. Tindall*, 455 F.3d 885, 888 (8th Cir. 2006) ("[T]he district court's determination of the date [of detention] was irrelevant to any material issue resolved at sentencing.").

Consistent with the preceding analysis, the Court also finds by a preponderance of the evidence that it was Hicks who offered Malone a job to fly to California, rent a vehicle, and drive it back to the Chicago/South Bend area. As mentioned above, in his proffer, Reid said that it was Hicks who asked Malone whether she "would be interested" in being "the driver" who brought the "drugs back to Indiana." (DE 143-1 at 44.) Malone's account in her proffer, and her testimony at the evidentiary hearing, confirmed this account.

Accordingly, the Court overrules Hicks' objections to paragraph 17 and 18 of the PSR.

### (3) Objections to Paragraphs 12 and 19

Hicks also objects to Paragraph 12 and the first sentence of paragraph 19. Hicks requests that a sentence be added to clarify the origin for Defendant's nickname of "King" and that additional language be included to indicate that Hicks did not travel to Los Angeles. (DE 131 at 1–2.) However, these two objections are not necessary to resolve as they will not impact the Court's analysis under 3553(a). The Court is well aware that Hicks' nickname is "King" and that he never traveled to Los Angeles in furtherance of this conspiracy, as the PSR already supports this. Additionally, nothing in the PSR indicates that the name "King" was given due to his role in the conspiracy.

Accordingly, the Court overrules Hicks' objections to paragraph 12 and 19 of the PSR.

### (4) Objection to Paragraph 20

This paragraph indicates that "Hicks called Malone and told her to get on the road." Defendant argues that this is factually incorrect and should be deleted.

The Court finds that the statement made in paragraph 20 is supported by a preponderance of the evidence. Malone stated to investigators during her proffer that "While [the group was in Las Vegas], Hicks called [her] to tell her to get on the road." (DE 143-1 at 25.) Malone also

confirmed during her testimony that Hicks called and told them "to get on the road." (DE 166 at 32:5–10.) Such a call taking place is consistent with the evidence showing that Hicks was actively monitoring the car. There are texts indicating that Hicks was following their GPS location and was giving them directions on how to drive. (DE 143-1 at 40–41.) Reid also confirmed that "[a]ll of the partie[s] were able to get Malone's GPS location so they knew where she was traveling to at all times." (*Id.* at 46.) Because Malone's testimony is largely consistent with Reid's testimony, as well as the texts, the Court finds that paragraph 20 of the PSR is supported by a preponderance of the evidence.

The Court notes that Hicks testified that he did not know whether he ever called Malone to get on the road. (DE 166 at 87:24-88:1.) The Court attributes this testimony little weight given Hicks' numerous false statements. *Infra pp.* 14–20. The Court also attributes this testimony little weight since he did not say he did not make such a statement, he merely stated that he did not have "knowledge" that such a statement occurred. (DE 166 at 87:24–88:1.)

Accordingly, the Court overrules the objection to paragraph 20.

### *(5) Objection to Paragraph 24*

This paragraph indicates that "Hicks, Reid and James were the primary individuals who wanted to obtain bulk amounts of methamphetamine, compiled their cash and had the connection to the source." (DE 130 ¶ 24.) The Defense wants to alter this paragraph to indicate that it was Reid and James who were the primary individuals, not Hicks. (DE 131 at 2.)

The Court overrules the objection and finds that paragraph 24 is supported by a preponderance of the evidence. The Court has already found, by a preponderance of the evidence, that Hicks (1) provided a substantial amount of money to Reid, (2) that he was providing this money expecting methamphetamine in return, (3) that he offered a job to Malone

where she would fly to California and then drive back, and (4) that he was the one who contacted Hook to also assist in driving. *See supra* pp. 4–12. The Court finds that this evidence demonstrates that Hicks was one of the primary individuals in the conspiracy.

Accordingly, the Court overrules the objection to paragraph 24.

## C.       Enhancement for Obstruction of Justice

Section 3C1.1 requires a 2-level increase in the offense level if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or *sentencing* of the instant offense of conviction." U.S.S.G. § 3C1.1 (emphasis added). One example of this is where an offender provides "materially false information to a judge." U.S.S.G. §3C1.1, comment. (n.4(f) and (h)). "A defendant obstructs justice not only when he makes it more difficult for the government to apprehend or (once he is apprehended) convict him, but also when he makes it more difficult for the court to give him the sentence that is his just desert." *United States v. Sapoznik*, 161 F.3d 1117, 1121 (7th Cir. 1998). Therefore, the Seventh Circuit has previously held that "an obstruction-of-justice enhancement is warranted when the defendant minimizes his role in a conspiracy during a sentencing hearing." *United States v. White*, 582 F.3d 787, 797 (7th Cir. 2009); *United States v. Sharp*, 436 F.3d 730, 737 (7th Cir. 2006).

The Court finds that Hicks obstructed justice by falsely testifying multiple times at his evidentiary hearing. This false testimony concerned three areas: (1) when Hicks first found out that Reid wanted the money to purchase methamphetamine; (2) what Hicks expected in return for the money he provided; and (3) the extent of Hicks' involvement in planning the scheme.

### *(1) When Hicks Figured Out Reid Wanted Money to Purchase Methamphetamine*

First, Hicks lied about when he figured out that the money he provided to Reid would be

used to purchase meth. Hicks initially testified on direct examination at his evidentiary hearing that it was only after Reid had approached him asking multiple times for money that he realized it was for meth. (DE 166 at 76:20–25.) Hicks testified that it was only around the "third or fourth conversation" that he realized the money would be used to purchase meth. (DE 166 at 77:8–10) On cross-examination, Hicks again testified that he learned the money was to purchase methamphetamine around the third conversation. (*Id.* at 95:17–20.) Each of these statements were false, and through the course of the cross-examination by Assistant United States Attorney, Joel Gabrielse, his initial story quickly broke down:

| | |
|---|---|
| **Gabrielse:** | You knew what Mr. Reid was doing in 2019, right? |
| **Hicks:** | What do you mean, what was he doing? |
| **Gabrielse:** | He was selling boatloads of drugs, right? |
| **Hicks:** | Yes. |
| **Gabrielse:** | And you knew that? |
| **Hicks:** | Yes. |
| **Gabrielse:** | In fact, you dealt drugs with him? |
| **Hicks:** | Yes. |

(DE 166 at 96:10–19.) After Hicks admitted that he had a lengthy history of dealing drugs with Reid, he also admitted that he knew the requested money was for methamphetamine as soon as Reid asked:

| | |
|---|---|
| **Gabrielse:** | . . . So this whole, "you didn't know what it was for" is nonsense, right? You knew what it was for. It was for meth. |
| **Hicks:** | I mean, yeah, I knew it was for meth . . . . |

(*Id.* at 96:24–97:1.) This admission was repeated yet another time.

| | |
|---|---|
| **Gabrielse:** | . . . And I'm saying you knew it was for meth as soon as he asked for money, right? |
| **Hicks:** | Yes. |

(*Id.* at 97:6–10.) Again, for a third time, Hicks admitted that it didn't take him three conversations to figure out the money was for meth:

| Gabrielse: | Okay. So when there's a proposal for Reid to get money and make a bunch of money on a project, you knew exactly what it was for, and it didn't take you three calls to figure it out, right? |
|---|---|
| Hicks: | I knew what it was for . . . . |

(*Id.* at 98:5–9.)

Accordingly, given that Hicks initially testified that it was not until the third or fourth conversation that he knew it was for meth, but then, upon being cross examined about his extensive drug dealing history with Reid, reversed course and testified that he knew the money was for methamphetamine right away, the Court finds that Hicks' initial version of events was a fabrication.

### *(2) Hicks' Expected Return for Providing the Money*

Hicks also falsely testified about his role in the crime and what he expected to receive in return for the cash he provided. At first, he testified that the extent of his role was simply as a "money lender to Mr. Reid." (DE 166 at 93:19–21.) He further testified that he only "expected to get paid back [the] loan amount plus some additional cash as interest," that this was "essentially the limit" of his involvement in the conspiracy, and that he wanted "the project to succeed but only so that [he] could get repaid in cash." (*Id.* at 93:22–94:7.) These statements were falsehoods.

This testimony was contradicted by (1) the information that Hicks provided in his proffer interview to Agent Focosi and (2) the information provided by numerous other witnesses to law enforcement agents. In his proffer to Agent Focosi, Hicks stated that Reid approached him seeking money because he knew some people in California who had methamphetamine. Hicks then provided multiple statements during his proffer interview that he was seeking methamphetamine in return for his cash, not simply interest:

| | |
|---|---|
| **Focosi:** | So, you and James were supposed to get twenty-five pounds of ice, is that what you're saying? |
| **Hicks:** | Yeah, together. |
| **Focosi:** | Together. |
| **Hicks:** | And the rest of it, I guess that was Pooh and Butter. . . . |

(Audio Proffer of Benjamin Hicks, Exhibit 2, DE 162.) Later in Hicks' proffer, he again

explained his role in similar terms:

| | |
|---|---|
| **Hicks:** | Me and James put up, I think it was about twenty-five . . . twenty-five thousand. |
| **Focosi**: | . . . . So, who did you give twenty-five thousand to? |
| **Hicks:** | Pooh. |
| **Focosi:** | . . . . And what were you going to get in return for the twenty-five thousand? What were you guys planning on getting? |
| **Hicks:** | I think it was twenty-five or thirty pounds [of methamphetamine]. |
| **Focosi:** | Ok, around twenty-five or thirty pounds that you and James were going to get for yourselves. |
| **Hicks:** | Yeah. |
| **Focosi:** | Now if I'm wrong, tell me I'm wrong. |
| **Hicks:** | Well, *I was getting it*, but the plan was that I was giving it to them so they could flip it or whatever they were going to do. |
| **Focosi:** | When you say them? |
| **Hicks:** | Uh, I was going to give it to James. . . James was going to look out for Pooh . . . . |

(*Id.* (emphasis added)) For a third time in his proffer, Hicks again explains that he was getting

methamphetamine in exchange for the money he provided:

| | |
|---|---|
| **Focosi:** | You put up twenty-five grand and you were supposed to get how many pounds? Roughly? |
| **Hicks:** | Roughly fifteen [pounds] I guess because it was between twenty-five and thirty. . . . |
| **Focosi:** | . . . . But the twenty-five thousand that you put up you were getting around fifteen for? |
| **Hicks:** | . . . . Half of twenty-five or half of thirty [pounds]. Cause I didn't know exactly how much they was getting. |

| Focosi: | But you knew you were getting for yourself fifteen [pounds]? |
|---|---|
| **Hicks:** | Yeah, somewhere around there . . . . |
| Focosi: | Somewhere around there . . . |
| **Hicks:** | Yeah and I was going to give James most of it and then the guy that was already out there [Steve Hook]. |

(*Id.*) Finally, for a fourth time, Hicks explains that he was the one who was getting

methamphetamine back in the deal:

| **Focosi:** | So, just so I understand this, you come up with twenty-five grand and you're supposed to get around fifteen [pounds of meth] for yourself that you're gonna give to whoever. But that's what you're going to get? Am I understanding that right? |
|---|---|
| **Hicks:** | Yeah. |

(*Id.*)

Each of the above exchanges support that Hicks was supposed to receive a certain

quantity of methamphetamine in exchange for his initial contribution, not simply interest on a

loan.

On re-direct, Hicks tried to explain away these statements by claiming that what he meant

was that, while the fifteen pounds was in exchange for the 25,000 dollars he was putting in, the

15 pounds was ultimately going to James and Reid, not him, and that he was not supposed to get

"any profits from those drugs." (DE 166 at 107:11–17.) This directly contradicts what Hicks said

at his proffer. In response to Focosi asking Hicks "what were you going to get in return for the

twenty-five thousand[,]" Hicks stated, "[h]alf of twenty-five or half of thirty [pounds]." If Hicks

was supposed to receive some percentage interest on his initial principal, rather than the drugs

themselves, then he would have responded to Focosi's inquiry with a sum of agreed upon interest

(for example, $2,000 plus his initial contribution) or he could have given some percentage rate of

interest (for example, 4% of his initial contribution). What Hicks would not have done, if he only

intended to receive interest on a loan, is state that he was getting "half of twenty-five or half of

thirty [pounds of methamphetamine]" in exchange for the money he provided. But that is precisely what Hicks said, in clear, unequivocal, repeated statements during his proffer interview.

The statements from other co-conspirators during their proffer interviews further undermine Hicks' testimony. For example, in his proffer, Terrence Reid stated that he was only going to be paid in "3–4 pounds of methamphetamine' and the "remainder of the methamphetamine was to be delivered for Hicks and James." (DE 143-1 at 46.) While their statements conflict to some degree regarding the amount of methamphetamine each man was to receive, both Reid and Hicks in their proffers confirmed that they were receiving quantities of methamphetamine in exchange for their respective roles (brokering the deal and providing bulk cash for the deal). Additionally, Reid's account that Hicks was going to receive the majority of the methamphetamine is supported by the statements of Tamara Tierney, who said in an interview that her father, David Tierney, had travelled "to California to pick up 36 pounds of methamphetamine for Hicks." (*Id.* at 9.)

Given Hicks' earlier proffer statements, as well as the statements from other co-defendants and witnesses, the Court finds that Hicks' statements contending that he was a mere "money lender to Mr. Reid" are false. (DE 166 at 93:19–21.)

### *(3)  Hicks' Involvement in Planning the Scheme*

Not only did Hicks falsely testify that he merely expected to receive his principal and interest back on the loan, he also falsely testified about other relevant aspects of the conspiracy. For example, Hicks minimized his participation in the crime by denying that he "ever" contacted past associate Steven Hook to ask him if he could help with the conspiracy. (*Id.* at 81:18–21.)

19

However, this is again inconsistent with other witness's statements as well as Hicks' proffer interview. Hook and Malone, in their interviews, provided statements supporting that it was Hicks who reached out initially to Hook. Hook explained that it was Hicks who first contacted him and asked "if [Hook] knew anyone with a valid driver's license that would be willing to fly to Los Angeles, California to drive a 'package' back to the Chicago, IL/ South Bend, IN area." (DE 143-1 at 16.) Malone, in her proffer, provided statements which also indicated that Hicks was the one who was in contact with Hook. She said that Hicks "told [her] that Stevie (later identified as Steven Hook) had originally had a driver, but that person had backed out." (*Id.* at 23.) Malone further stated that "Hook was the person who would get drivers for [Hicks] to help drive back vehicles." (*Id.*) Finally, Hicks' own proffer interview indicates that he was the one with the connection to Hook:

| **Focosi:** | But you knew you were getting for yourself 15? |
|---|---|
| **Hicks:** | Yeah, somewhere around there . . . And I was going to give James most of it and *then the guy that was already out there.* So, the white dude that was already out there. That was in Vegas already. *I was going to look out for him.* But . . . |
| **Focosi:** | So the white guy? |
| **Hicks:** | Yeah, not, not the guy that Pooh brung. The guy that was already out there, that I had known from South Bend already. |
| **Focosi:** | So, what's his name. |
| **Hicks:** | Steve. |
| **Focosi:** | You know his last name? |
| **Hicks:** | I think it's Hook or Hike or something like that. |

(Audio Proffer of Benjamin Hicks, Exhibit 2, DE 162 (emphasis added).)

Given the proffer statements of Hicks, Hook, and Malone, the Court finds that Hicks statements at his evidentiary hearing denying that he "ever" contacted Hook to help with the conspiracy were false.

### *(4)  Enhancement of 2 Points is Warranted*

Hicks' testimony at his evidentiary hearing justifies a two-level enhancement. The

Seventh Circuit has been clear that "an obstruction-of-justice enhancement is warranted when the

defendant minimizes his role in a conspiracy during an evidentiary hearing." *White*, 582 F.3d at

797; *Sharp*, 436 F.3d at 737. Here, Hicks falsely minimized his role in a conspiracy by making it

appear (1) as if he were a mere money lender, rather than a partner who would receive

methamphetamine in exchange for the money provided, (2) as if he did not initially know the

purpose of the request for money when, in fact, he immediately knew what the money was for,

and (3) as if he did not have an active role in the planning when, in fact, he was the one who

called Hook to recruit him.

These deceptions warrant a two-level increase in his offense level.


### D.      Acceptance of Responsibility Reduction

Under Guidelines Section 3E1.1, a defendant is eligible for a two to three level reduction

"[i]f the defendant clearly demonstrates acceptance of responsibility for his offense . . . ."

U.S.S.G. §3E1.1. In determining whether this reduction is warranted, the Court is to consider,

among other things, whether the defendant "truthfully [admitted] the conduct comprising the

offense(s) of conviction, and truthfully admit[ed] or not falsely den[ied] any additional relevant

conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct)". U.S.S.G.

§3E1.1 comment. (n.1(A)). The Seventh Circuit has held that such a reduction is only warranted

if a defendant "(1) demonstrate[s] sincere remorse or contrition, (2) truthfully admit[s] the

conduct comprising the offense, and (3) neither falsely nor frivolously contest[s] relevant

conduct." *United States v. Sandidge*, 784 F.3d 1055, 1063 (7th Cir. 2015) (quoting *United States

v. Eschman,* 227 F.3d 886, 891 (7th Cir. 2000)).

Here, Hicks has falsely denied relevant conduct by (1) saying that he did not initially know the purpose of Reid's request for money, (2) claiming that he simply wanted interest back on the loan, and (3) stating that he did not "ever" contact Hook. As explained above, each of these statements was false. Furthermore, each of these statements pertained to relevant conduct going to the level of his involvement in the conspiracy. The circumstances surrounding the money provided by Hicks to Reid constitutes relevant conduct because the money provided financial backing for the conspiracy. Additionally, Hicks' contact with Hook is relevant conduct because the contact was made for the purpose of recruiting drivers to take the methamphetamine back from California.

Accordingly, the Court finds that Hicks is not eligible to receive a reduction for acceptance of responsibility, since Hicks made false claims concerning relevant conduct. Such a finding is also in line with the presumption that one who obstructs justice has not accepted responsibility for his criminal conduct. *See* U.S.S.G. §3E1.1, comment. (n.4) ("Conduct resulting in an enhancement [for obstruction of justice] ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct."); *United States v. DeLeon*, 603 F.3d 397, 408 (7th Cir. 2010) ("A defendant whose sentence was properly enhanced for obstruction of justice is presumed not to have accepted responsibility."); *United States v. Davis*, 442 F.3d 1003, 1009 (7th Cir. 2006) (same).

**E.     Conclusion**

For the reasons stated above, each of Hicks' objections to the PSR are overruled. (DE 131.) Hicks original base offense level for violating 21 U.S.C. § 846 was 38. (DE 130 ¶ 30.) A two-level increase in the offense level is warranted under Guideline Section 3C1.1 due to Hicks falsely testifying in order to minimize his role in the conspiracy, making his adjusted offense

level 40. Furthermore, because Hicks made false claims concerning relevant conduct, he is no longer eligible for the acceptance of responsibility reduction under Guidelines Section 3E1.1. Therefore, Hicks' total offense level is 40.

SO ORDERED.

ENTERED: October 3, 2022

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court